[No. G035627. Fourth Dist., Div. Three. Apr. 30, 2007.]

COUNTY OF ORANGE et al., Defendants and Appellants, v. BARRATT AMERICAN, INC., et al, Plaintiffs and Appellants.

422

COUNSEL

Law Offices of Walter P. McNeill and Walter P. McNeill for Plaintiffs and Appellants. ·

Best Best & Krieger, Jeffrey V. Dunn and Marc S. Ehrlich for Defendants and Appellants.

OPINION

SILLS, P. J.—

## INTRODUCTION

The Mitigation Fee Act (Gov. Code, § 66000 et seq.)[1] governs fees charged by local agencies for development projects, water or sewer connections, and zoning and building permits, and provides remedies when the fees are excessive. Such fees cannot exceed the "estimated reasonable cost of providing the service for which the fee is charged," unless the excessive fee is approved by a two-thirds vote of the electorate. (§ 66014, subd. (a).) If an excessive fee is not so approved, and "the fees or service charges create revenues in excess of actual cost, those revenues shall be used to reduce the fee or service charge creating the excess." (§ 66016, subd. (a).)

When a county is the local agency imposing fees, its board of supervisors is given the authority "to increase or decrease the fee or charge, that is otherwise authorized to be levied by another provision of law, in the amount reasonably necessary to recover the cost of providing any product or service or the cost of enforcing any regulation for which the fee or charge is levied. . . . Indirect costs that may be reflected in the cost of providing any product or service or the cost of enforcing any regulation shall be limited to those items that are included in the federal Office of Management and Budget Circular A-87 on January 1, 1984." (§ 54985, subd. (a).)[2]

---

[1] All statutory references are to the Government Code unless otherwise specified.

[2] Circular A-87 (hereafter referred to as OMB A-87) was issued by the Office of Management and Budget to "establish[] principles and standards for determining costs applicable to grants, contracts, and other agreements with State and local governments and federally-recognized Indian tribal governments." The principles "are designed to provide the basis for a uniform approach to the problem of determining costs and to promote efficiency and better relationships between grantees and the Federal Government. . . . They are designed to provide that federally-assisted programs bear their fair share of costs recognized under these principles except where restricted or prohibited by law. . . . [¶] . . . [¶] . . . The application of these principles is based on the fundamental premises that: [¶] . . . State, local, and federally

The County of Orange (County) accumulated a surplus of fee revenues because it collected more in fees for building inspections and construction plan checks than the cost of performing the services for which the fees were charged. After it passed a resolution lowering those fees, the new fee schedule was challenged by Barratt American, Inc. (Barratt), on the grounds that the County had violated section 66016, subdivision (a) because it had failed to apply the excess revenues to lower the new fees even more. The trial court found the County had used most of the excess revenue in expenditures that were reasonable and necessary to support the cost of the services. But the trial court found the County had not shown the expenditures were reasonable and necessary as to $4.5 million of the excess revenue, and ordered the County to lower fees until that amount was dissipated. It also awarded attorney fees to Barratt under the private attorney general statute.

The County contends the trial court misconstrued section 54985 as incorporating a reasonableness standard from OMB A-87, thereby requiring it to justify its expenditures of the surplus as reasonable and necessary. Alternatively, the County claims the record demonstrates all its expenditures were reasonable and necessary. It attacks the attorney fee award on the grounds that the litigation result did not confer a significant benefit on the general public and merely served Barratt's pecuniary interest.

In its appeal, Barratt contends the trial court erred in its construction of section 66016, subdivision (a). It claims the statute does not allow the County to spend the surplus at all but requires that the surplus be used exclusively to directly reduce future fees.

We find the contentions of both parties to be without merit, and we affirm the judgment.

## FACTS

Between 1992 and 1999, the County imposed fees for building inspections and construction plan checks under the fee schedule enacted by Orange County Resolution No. 92-1283. The fees were collected by the planning and development services department (PDSD) and deposited in a special revenue fund known as "Fund 113." The amount of each fee was based on the total value of construction, and over the years the revenue collected exceeded the cost of providing the services necessary to issue the permits and perform the plan checks, resulting in a surplus of millions of dollars.

recognized Indian tribal governments are responsible for the efficient and effective administration of grant and contract programs through the application of sound management practices." (Off. of Management and Budget, Circular A-87, 46 Fed.Reg. 9548 (Jan. 28, 1981).)

In 1999, the County hired DMG Maximus, a government finance consultant, to analyze the costs of providing building inspection and plan check fees. It concluded the County was overcollecting and the fees needed to be lowered 33 percent to bring revenue in line with costs. As a result, PDSD proposed a fee reduction of 28 percent and a refund equal to the difference between the old fee rate and the new fee rate to any permit applicant who had not received a final inspection by the effective date of the revised fee rates. The proposal explained that "[t]he fee reduction will also reduce the current [Fund 113] balance, which has increased with the over-recovery of some permit costs." The board of supervisors passed the fee reduction proposal as Orange County Resolution No. 99-176 in May 1999 (Resolution 99-176).

Barratt filed a complaint in September 1999 challenging Resolution 99-176 on the grounds that the County had failed to apply excess revenues to reduce fees and had adopted fees that were excessive and had no relationship to the cost of the services provided. The complaint also included a petition for writ of mandate to compel the County to perform "their clear, plain, ministerial statutory duty under Government Code section 66016(a) to apply excess revenues . . . to reduce the fee." The County answered the complaint, and the case was bifurcated into three phases.

In phase I, the trial court adjudicated stipulated legal issues, issuing its ruling on December 31, 2000. It found the County had an "ongoing statutory duty to apply excess fee revenues to reduce the fees collected under 99-176 and if it is determined in the second phase of the trial that the County failed to apply any of the existing surplus to reduce fee[s], that is relevant to the validity of Resolution 99-176." The trial court found the County's duty could be enforced by mandate because, although "the County does have some discretion in its decision regarding how and when to apply the surplus to reduce fees," it cannot "refuse to take any action at all . . . ." The trial court also ruled that the interest on the Fund 113 surplus "should follow the principal of the surplus and should be characterized as part of the total excess fee revenue . . . ." The trial court also ruled the County "has the burden of proof on showing that the fees under Resolution 99-176 comply with the Government Code . . . ."

In February 2001, shortly after the phase I rulings were issued, the County enacted Orange County Ordinance No. 01-02, which reduced building inspection and permit fees by an additional 5 percent (Ordinance No. 01-02). The agenda item transmittal memorandum reported PDSD had refunded $1,038,582 under Resolution 99-176. It explained that the number of permits issued in fiscal year 1999/2000 decreased by 10.5 percent, but "[t]he change in permit activities and reduced revenues did not have an adverse impact on services to the development community nor on departmental operations . . . .

Prudent management and financial control of the Fund's reserve allowed PDSD to meet the following obligations and requirements: 1) completion of works in progress; 2) facility improvements; 3) and capital and information systems expenditures." PDSD reported the Fund 113 balance had been reduced from $18.5 million in 1999 to $13.9 million as of the second quarter of 2000/2001, explaining that "[t]he decline is a result of the 28 percent reduction in Building Inspection and Plan Check fees, fee refunds, reduction in permits issued, reduced revenue, and expenses relative to operating costs, facility improvements, capital purchases, and approved technology development costs for information services."

In response to Ordinance No. 01-02, Barratt filed a second action challenging its validity for failure to use the surplus to reduce future fees and seeking a writ of mandate to compel the County to perform its statutory duty to do so. Barratt additionally alleged that Ordinance No. 01-02 adopted a fee schedule in violation of section 54985 and OMB A-87. The first and second actions were deemed related and were set for a phase II trial to determine stipulated legal issues.

In phase II, the trial court found that the County was required to use surplus fee revenues to reduce the fees charged to fee payers. "[T]he language of GC 66016(a) is clear and neither party disputes the County's duty to use surplus fee revenues to reduce the fees charged to fee payers." It found that OMB A-87 "has nothing to do with the method of disposing of the existing surplus and it does not create a remedy for the plaintiffs. OMB A-87 is merely a list of the direct and indirect costs that may or may not be included in fees to be charged as the estimated cost of providing services. OMB A-87 has no application to the determination of whether the County has complied with its duty to reduce user fees or whether the County has improperly spent a portion of the Fund surplus. However, OMB A-87 does provide the guideline for the proper direct and indirect costs to be used in estimating the cost of providing services. It is relevant to determining if the user fees may have to be reduced in the future and if so, how much . . . ." The court also ruled that "if the County's budget reflects user fees based on allowable costs per OMB A-87 and the County's expenditure of the surplus on those allowable direct and indirect costs (per OMB A-87) reduces its need for revenue to meet the costs of providing services, and as a result, the County reduces future user fees, this is an acceptable method of meeting the County's duty under GC 66016(a)."

The trial court reserved for phase III "a factual determination of whether the County has, or is in the process of, adequately performing its duty under GC 66016(a) to use [Fund 113] surplus to reduce future user fees in a reasonable and timely manner. Contained within this general issue are the

factual questions of how the County spent the approximate $11 million of the Fund Surplus since 1999 and what direct and indirect costs are being used by the County to determine the estimated costs of providing services." With the agreement of the parties, the trial court appointed a special master to identify the actual revenues and costs for PDSD "since May 1999 forward. . . . The goal is to identify the actual revenues and costs by category . . . given the guidelines or parameters of [OMB] A-87." The special master was also directed to determine how the surplus had been spent. In September 2002, the special master reported that the surplus had been completely depleted.

The special master petitioned for instructions regarding the extent to which OMB A-87 applied to the county's expenses. The trial court, which by then had changed from Judge William F. McDonald to Judge C. Robert Jameson, interpreted the phase II ruling on December 20, 2002: "Taking the ruling as a whole, OMB A-87 applies to the County's existing costs, as well as to the expenditure of the surplus funds and provides a guideline for determining if the surplus was spent on allowable costs from 1999 to the date the surplus was exhausted. Counsel for the County has agreed that OMB A-87 applies to the County's existing costs. There is no rationale for the position that OMB A-87 does not apply to the costs on which the surplus funds were spent."

Subsequently, the special master petitioned for further instructions because the parties disagreed about the effect of the trial court's December 2002 ruling. On March 27, 2003, the trial court ruled: "OMB A-87 . . . applies specifically as a guideline to determine the reasonableness and necessity of each line item expenditure and overhead allocation within Department 113 including the expenditure of the $18 million surplus. Each of the expenditures shall meet and be consistent with accounting guidelines as prescribed by OMB A-87."

In June, the trial court clarified its order "to indicate that OMB A-87 applies to indirect costs only." It continued, "The Court acknowledges that respect must be given to the discretionary decisions of the County's Building Permit Department with regard to the establishment of its operational costs and the fees assessed to recover those costs. However, the Court finds that within the exercise of its discretion, the County has a duty under Government Code Section 54985 to incur only those direct and indirect costs which are reasonable and necessary as a basis for the fees charged. A determination of the reasonableness and necessity of fees must include a determination of the reasonableness and necessity of the costs upon which those fees are based. Government Code Section 54985 makes no distinction between direct and indirect costs when applying the 'reasonable and necessary' standard." The trial court appointed Professor William W. Holder as an expert under Evidence Code section 730 to assist "the Court in its determination of the propriety,

reasonableness and necessity of the costs incurred by [PDSD] from May 1999 to present and the expenditure of the $18 Million Dollar surplus."

In January 2004, the special master filed his final report, finding "the number of permits and revenue associated with the permits . . . declined by 40 percent to 60 percent when comparing FY 2001/02 to four years earlier (FY 1998/99); (b) the headcount and payroll costs to run BU113 have increased during the same four year comparison by 13 percent to 20 percent; (c) Other expenditures that have been charged to BU113 (primarily overhead costs) increased 49.7 percent; (d) with overall revenues and permit activity down in excess of 40 percent and overall costs to run BU113 up nearly 33.8 percent, the SM observed a multi-year counterintuitive trend that warranted further investigation." The trial court "accept[ed] the findings and final report of the special master filed on 1-20-04" on April 9, 2004.

On February 4, 2004, the special master filed a supplemental report explaining that the surplus was spent by (1) reductions in revenue (caused by two fee reductions and reduced volume) of $7.5 million; (2) increased expenses of $5.8 million; and (3) net charge for a new computer system (Automated Permit and Processing System [APPS]) of $5 million. He observed, "The surplus would have lasted longer if the County's spending had not grown so disproportionately to its building permit revenues during the periods in question."

In May 2004, Holder filed his final report, in which he had investigated the costs of providing building permit and inspection services from May 1999 to the present and the application of the guidelines of OMB A-87 to the indirect costs. He observed, "The costs incurred in Fund 113, in hindsight, exceeded those necessary to serve the demands ultimately experienced. . . . We have explored with County management the factors they considered and assumptions they adopted in planning and developing their budgets for each of the years in question. . . . While we understand the general views of department management we have not obtained budgeting and planning documents that support those representations. [¶] We obtained additional information from County management about the costs incurred in Fund 113." PDSD had asked for extra help for fiscal year 1999/2000 "[d]ue to growth in building and grading activity"; but Holder was unable to identify any growth trends from the data provided by the County. Rather, the data suggested the County expected little, if any, growth. Holder asked County management about the substantial increase in overhead charged to Fund 113, but was informed "that there were no changes in the allocation methods that were used prior to and during the period of time at issue in this matter." Holder concluded, "Because the County has not provided us with evidence constituting an adequate basis to conclude that costs incurred in excess of price level increases that were incurred in Fund 113 during 1999–2002 . . . were reasonably necessary, we

are unable to and do not express any such assurance." Holder additionally opined that the cost of the new computer system should be amortized over its expected useful life.

As phase III approached trial, the County questioned whether it bore the burden of proof on the factual issue of whether its surplus-reducing expenditures were reasonable. After briefing, the trial court ruled that the County bore the burden of proof "to establish the reasonableness and necessity of expenditures for the depletion of the 18.5 million dollar surplus, the subject of this litigation. . . . The defendants are in a better position to know what they spent the surplus for and whether the expenditures were allowable as indirect costs pursuant to OMB A-87. [The ruling is] [c]onsistent with the ruling of the Court in phase I of this case, that the defendants have the burden of showing that the fees bear a fair and reasonable relationship to the burden on or benefits from the regulated activity."

The parties agreed to submit the following evidence for trial: (1) the reports by the special master, the court-appointed expert Holder, and a report by the County's expert, Professor Cornelius Tierney; (2) a set of documents in lieu of testimony; and (3) a list of 91 stipulated facts. The trial court expressly considered all these items of evidence, plus trial briefs and oral argument, in making its decision.

The trial court issued its ruling on January 3, 2005. It found the County had partially complied with its duty to use the $18.5 million surplus to reduce future user fees by expending a portion of the surplus on reasonably necessary direct and indirect costs. First, it found the decision to expense approximately $5.5 million for the APPS computer system was proper and had the effect of reducing future user fees. Second, it found the decision to maintain and even increase the number of employees in the PDSD during the four years in question resulted in an increase of approximately $1.5 million to Fund 113. While the decision to do this, in the face of declining activity and revenues from permits and plan checks, "may not have been financially sound" in hindsight, "it was a decision rightfully within the County's management purview at the time it was made and cannot be found to be unreasonable." Third, the court found there was approximately $6 million in decreased revenues during the four years, due to a decline in the number of requested permits and services. "The County was able to maintain or increase its services and employee level, refund $1 million dollars to users and purchase the APPS system by expending funds from the surplus rather than increasing the fees. This had the effect of maintaining a reduction of user fees for a period of three years beyond what would have been possible without using surplus funds. The court finds that this was a reasonable and necessary use of a portion of the surplus funds."

The court found the reasonable expenses totaled $14 million, and the County had failed to meet its burden as to the remaining $4.5 million. It noted, "Professor Holder stated in his opinion that the County failed to submit to him the requested documentation to support the reasonable necessity of the costs incurred in Fund 113 in excess of price level increases during the period 1999 to 2002." Therefore, the court ordered the County "to reduce future building permit and plan check fees . . . until such time the $4.5 million dollar surplus is exhausted."

The County did not request a statement of decision. Nevertheless, it filed objections to the trial court's order, which it called a statement of decision, and proposed changes to the trial court's calculations of the expenditures of the surplus. Under the County's proposed changes, the reasonable expenses totaled $23,354,875, or $4,854,875 more than the original surplus amount. The trial court overruled the objections, stating, "The court's 1-3-05 minute order was not a statement of decision nor intended to be a statement of decision."

Barratt moved for attorney fees under the private attorney general statute (Code Civ. Proc., § 1021.5). The trial court found there was a significant benefit to those persons who apply for permits and plan checks. "The indirect benefit is to homeowners and home purchasers of Orange County, and that group is a large class and significant. [¶] I don't think that there was any other mechanism by which the challenge could have been made; so private enforcement was necessary in this case." The court enhanced the actual fees by 250 percent, finding the case presented unique issues, Barratt's counsel was "one of a few people capable of addressing those issues," and the hourly rate of $275 was "extremely reasonable and especially by Orange County standards." The court awarded $1,217,838.75 in fees and $161,735.43 in costs.

### DISCUSSION

#### 1. *Statutory construction*

##### Section 66016, subdivision (a)

In its appeal, Barratt contends the trial court misconstrued section 66016, subdivision (a) by finding that the County's duty to reduce fees when a surplus exists could be met by not only reducing its fees but spending the surplus. Barratt claims the trial court's construction erroneously allows County administrators to spend surplus fee revenues as a substitute for legislatively increased fees. We disagree.

Barratt first argues the trial court's interpretation violates the statutory scheme as explained in *Barratt American, Inc. v. City of Rancho Cucamonga* (2005) 37 Cal.4th 685 [37 Cal.Rptr.3d 149, 124 P.3d 719]. There, the court decided, inter alia, the questions (1) whether a developer who challenges a local agency's fees for building inspections and permits can state causes of action for both the remedies of a prospective fee reduction (§ 66016, subd. (a)) *and* a refund of excessive fees (§ 66020); and (2) which limitations period applies to a claim that the building permit fees are excessive. (37 Cal.4th at pp. 691–692.)

The court explained that sections 66014 and 66016 expressly apply to building inspection and permit fees. Section 66014 permits local agencies to impose such fees which "may not exceed the estimated reasonable cost of providing the service for which the fee is charged"; section 66016, subdivision (a) provides the remedy for overcollection of such fees by stating, "If, however, the fees or service charges create revenues in excess of actual cost, those revenues shall be used to reduce the fee or service charge creating the excess." Both sections state that any proceeding to attack such fees "shall be brought pursuant to Section 66022." (§§ 66014, subd. (c), 66016, subd. (e).) Section 66022 provides that any action to "attack, review, set aside, void, or annul an ordinance, resolution, or motion adopting a new fee or service charge, or modifying or amending an existing fee or service charge, adopted by a local agency . . . , shall be commenced within 120 days of the effective date of the ordinance, resolution, or motion." (§ 66022, subd. (a).) Section 66022 is expressly made applicable "only to fees, capacity charges, and service charges described in and subject to Sections 66013, 66014, and 66016." (§ 66022, subd. (c).)

The developer claimed it did not seek to challenge the ordinances imposing the building inspection and plan review fees under section 66022. Rather, it claimed "it is protesting the imposition of specific fees on a particular development project, which is governed by the separate protest and refund procedures and remedy and limitations scheme set forth in sections 66020 and 66021." (*Barratt American, Inc. v. City of Rancho Cucamonga, supra*, 37 Cal.4th at p. 695.) The court explained that those sections only applied to " 'development fees' that alleviate the effects of development on the community and does not include fees for specific regulations or services," such as building permit and plan review fees. (*Id.* at p. 696, italics omitted.)

The court contrasted the remedies of prospective reduction and refund: "Section 66016 applies specifically to building permit fees and states

the remedy for any facial overcharges:. 'If however, the fees or service charges create revenues in excess of actual cost, those revenues *shall be used* to reduce the fee or service charge creating the excess.' (§ 66016, subd. (a), italics added.) Surplus fees that have been refunded cannot simultaneously be 'paid forward' to reduce fees. In other words, permitting both retrospective refund and prospective reduction remedies would allow two different dispersions of the same funds and would create incongruous results." (*Barratt American, Inc. v City of Rancho Cucamonga, supra,* 37 Cal.4th at .p. 699.) The court also contrasted the remedy for regulatory overcharges with the remedy for unauthorized special taxes: "The specific statute—section 66016—provides the exclusive remedy for overcharges. If actual revenues exceed actual costs, the City must make a prospective fee adjustment by using that surplus, in lieu of a fee revenue, to cover future expenses. (§ 66016, subd. (a).) It cannot refund the excess or transfer it to the City's general fund to replace or augment tax revenue. [Citations.] [¶] Accordingly, the dollar-for-dollar penalty or offset allowed [for unauthorized special taxes] does not apply to [the developer's] claims." (*Id.* at pp. 700–701.)

Here, Barratt contends the foregoing language in *Rancho Cucamonga* conclusively establishes that section 66016, subdivision (a) prohibits spending the surplus on fee-related expenses and requires the fees be actually lowered. We do not reach the same conclusion. The Supreme Court language was directed towards comparing the prospective fee reduction remedy and the refund remedy. In describing the fee reduction remedy, the court said nothing that would preclude spending the surplus for fee-related expenses and keeping future fees constant in lieu of directly reducing future fees.

Barratt next contends that the trial court's construction of section 66016, subdivision (a) as allowing the County to spend the surplus violates the canons of statutory construction, which require that words of a statute must be given their plain meaning and a commonsense interpretation. Barratt asserts that "reduce" means "reduce" and cannot encompass spending the surplus on related expenses. We disagree.

"In determining the intent of the Legislature, the court must first look to the language of the statute. If that language is clear and unambiguous and there is no question as to the Legislature's intent, there is no need for construction, and courts should not indulge in it." (*Carlton Browne & Co. v. Superior Court* (1989) 210 Cal.App.3d 35, 40 [258 Cal.Rptr. 118].) "[S]tatutes must be given a reasonable and common sense construction in accordance with the apparent purpose and intention of the lawmakers—one that is

practical rather than technical and that will lead to a wise policy rather than to mischief or absurdity [citation]." (*People v. Hinojosa* (1980) 103 Cal.App.3d 57, 65–66 [162 Cal.Rptr. 793].)

■ The purpose of section 66016, subdivision (a) was to prevent a local agency from imposing fees that were unrelated to the services provided. To this end, the Legislature directed an agency that had collected fee revenue in excess of the cost of related services to use the surplus to reduce those same fees, not to use the surplus for general expenses. Using the surplus fee revenue to cover the reasonable and necessary costs of the services rather than merely lowering the fees until the surplus is dissipated has the effect of "reducing" the future fees. This construction comports with common sense by allowing the County flexibility in managing Fund 113 as long as those costs are reasonable and necessary.

Barratt next contends the trial court's remedy violates the letter and spirit of section 66016 in several ways. First, it points out that subdivision (b) of section 66016 requires that fees can be levied only by a legislative body. "Any action by a local agency to levy a new fee or service charge or to approve an increase in an existing fee or service charge shall be taken only by ordinance or resolution. The legislative body of a local agency shall not delegate the authority to adopt a new fee or service charge, or to increase a fee or service charge." Barratt argues the trial court's remedy allows County administrators to substitute their judgment for the board of supervisors and effectively arrogate the power to raise or modify fees. But the gross amount of revenue and expenditures from Fund 113 are budgeted items approved by the board of supervisors annually. Thus, the County makes an affirmative decision on the amount of the fees and the concept of using the surplus to cover fee-related costs.

Second, Barratt contends the administrators' unilateral decisions to spend surplus fee revenues on expenses as a substitute for fee increases violates the notice and hearing process prescribed by section 66016, subdivision (a).[3] Barratt complains that spending surplus fee revenues in lieu of fee increases

---

[3] Section 66016, subdivision (a) provides in part: "Prior to levying a new fee or service charge, or prior to approving an increase in an existing fee or service charge, a local agency shall hold at least one open and public meeting, at which oral or written presentations can be made, as part of a regularly scheduled meeting. Notice of the time and place of the meeting, including a general explanation of the matter to be considered, and a statement that the data required by this section is available, shall be mailed at least 14 days prior to the meeting to any interested party who files a written request with the local agency for mailed notice of the meeting on new or increased fees or service charges. . . . At least 10 days prior to the meeting, the local agency shall make available to the public data indicating the amount of cost, or estimated cost, required to provide the service for which the fee or service charge is levied and the revenue sources anticipated to provide the service, including General Fund revenues."

omits the public input from the process. An increased fee proposal might not pass the legislative body because the public might convince it that increased fees are not needed. But section 66016 does not provide for public notice and protest opportunities for the local agency's implementation of the fee reduction remedy. This is not the same as imposing new or increased fees.

Lastly, Barratt contends the trial court's spending remedy contravenes the purpose of the Mitigation Fee Act, which is to prevent the levy of excessive fees. Here, the County was allowed to spend more than $14 million in fee-related expenses in three years. If these expenditures are viewed conceptually as a substitute for collecting equivalent future fees, then such fees are excessive.

This is where judicial oversight prevails. The Legislature has provided avenues for challenges to the County's spending, which this action represents. Whether the County's expenditures were reasonable and necessary was the subject of phase III of the trial. The trial court made findings on that issue. The fact that Barratt does not agree with the result does not invalidate the process.

## Section 54985

The County contends the trial court misconstrued section 54985 as incorporating a "reasonable and necessary" standard from OMB A-7 into the evaluation of the permissible indirect costs of providing the services for which the fees are charged. It points out that section 54985 refers only to OMB A-87's list of indirect costs, not its criteria, standards, or procedures.

Section 54985 was enacted in June 1983. It provides in part: "(a) Notwithstanding any other provision of law that prescribes an amount or otherwise limits the amount of a fee or charge that may be levied by a county, a county service area, or a county waterworks district governed by a county board of supervisors, a county board of supervisors shall have the authority to increase or decrease the fee or charge, that is otherwise authorized to be levied by another provision of law, in the amount reasonably necessary to recover the cost of providing any product or service or the cost of enforcing any regulation for which the fee or charge is levied. The fee or charge may reflect the average cost of providing any product or service or enforcing any regulation. *Indirect costs that may be reflected in the cost of providing any product or service or the cost of enforcing any regulation shall be limited to those items that are included in the federal Office of Management and Budget Circular A-87 on January 1, 1984.*" (Italics added.)

Before the enactment of section 54985, state law fixed the rates of certain fees for county services, and counties were put in the position of having to repeatedly ask the Legislature to raise the limits on these fees as their costs changed. Section 54985 was enacted to allow counties to levy fees higher than the statutory limits, so long as the fees did not exceed the average cost of providing the service. (Sen. Com. on Local Government, Rep. on Assem. Bill No. 151 (1983–1984 Reg. Sess.) June 1, 1983.) The cost of providing the service includes indirect costs. The summary by the Senate Committee on Local Government explains that indirect costs are those "as calculated under federal accounting guidelines (OMB Circular A-87)." The summary by the Assembly committee counterpart explains indirect costs would be limited "to those items included as indirect costs in Circular A-87 of the Federal Office of Management and Budget."

OMB A-87 defines "indirect costs" as follows: "[T]hose (a) incurred for a common or joint purpose benefiting more than one cost objective, and (b) not readily assignable to the cost objectives specifically benefited, without effort disproportionate to the results achieved. . . . [¶] . . . All grantee departmental indirect costs, including the various levels of supervision, are eligible for allocation to grant programs provided they meet the conditions set forth in this Circular. In lieu of determining the actual amount of grantee departmental indirect cost allocable to a grant program, the following methods may be used. [¶] a. Predetermined fixed rates for indirect costs. · . . [¶] b. Negotiated lump sum for overhead. . . ."

OMB A-87 lists standards for determining whether selected items of cost will be allowed; the standards "will apply irrespective of whether a particular item of cost is treated as direct or indirect cost. Failure to mention a particular item of cost in the standards is not intended to imply that it is either allowable or unallowable, rather determination of allowability in each case should be based on the treatment of standards provided for similar or related items of cost." The list includes 28 items, from Accounting to Travel. Each item listed includes a description of allowable and unallowable costs. For example: "6. *Budgeting.* Costs incurred for the development, preparation, presentation, and execution of budgets are allowable. Costs for services of a central budget office are generally not allowable since these are costs of general government. However, where employees of the central budget office actively participate in the grantee agency's budget process, the cost of identifiable services is allowable."[4]

---

[4] OMB A-87 is referenced in other California statutes, as indicated by the italicized phrases below:

—Revenue and Taxation Code section 75.60, subdivision (b)(1) (reimbursement for County administrative costs associated with the supplemental assessment roll): " 'Actual administrative

The County's contention that OMB A-87 merely provides a list of allowable indirect expenses makes no sense. First, the circular explains that the list is not exclusive, allowing for other categories to be evaluated under the standards set out for similar listed ones. Second, the standards for each category are integral to the category itself. Separating the listed item from its standards renders it devoid of meaning.

The County also claims the trial court's construction of OMB A-87 and section 54985 violates the separation of powers doctrine. It contends that permitting an inquiry into the reasonableness and necessity of its surplus-reducing expenses invades the County's constitutionally protected discretion to adopt budgets, allocate resources and set fees. It argues that setting fees, adopting a budget, making appropriations, and setting the number and conditions of employment for county employees are quintessentially legislative functions, not judicial. The County points out that the gross expenditures from Fund 113 were in the budgets for each of the fiscal years in question, which were approved by the board of supervisors and filed with the State Controller.

costs' also includes those indirect costs for administration, data processing, collections, and appeal that are incurred by county auditors, assessors, and tax collectors and *are allowed by state and federal audit standards pursuant to the A-87 Cost Allocation Program.*" (Italics added.)

—Revenue and Taxation Code section 95.2, subdivision (a)(2) (portion of administrative costs attributable to incorporated cities and other local jurisdictions): Property tax administrative costs shall include *"applicable administrative overhead costs as permitted by federal Office of Management and Budget Circular A-87 standards . . . ."* (Italics added.)

—Revenue and Taxation Code section 95.3, subdivision (a) (administrative cost apportionment factor): "[P]roperty tax administrative costs shall also include *applicable administrative overhead costs allowed by the federal Office of Management and Budget Circular A-87 standards . . . ."* (Italics added.)

—Government Code section 8589.10, subdivision (d) (definitions for the State Assistance for Fire Equipment Act): " 'Indirect expenses' means *those items which are identified as indirect costs in the federal Office of Management and Budget Circular A-87* on January 1, 1985." (Italics added.)

—Government Code section 14529.12, subdivision (b) (compliance with state and federal law for agreements between agencies on state highway projects): "[T]he expenditure of funds pursuant to those agreements shall comply with all applicable federal and state laws and regulations and be subject to the *administrative operating procedures set forth in Federal Office of Management and Budget Circulars A-87, A-102, and A-128, but not to any other state agency procedures or requirements.*" (Italics added.)

—Government Code section 29550, subdivision (a)(1) (reimbursement of county expenses incurred in booking employees of local agencies): "The fee imposed by a county pursuant to this section shall not exceed the actual administrative costs, including *applicable overhead costs as permitted by federal Circular A-87 standards . . . ."* (Italics added.)

—Government Code section 29550.2, subdivision (a) (criminal justice administration fee): "The fee which the county is entitled to recover pursuant to this subdivision shall not exceed the actual administrative costs, as defined in subdivision (c), including *applicable overhead costs as permitted by federal Circular A 87 standards,* incurred in booking or otherwise processing arrested persons." (Italics added.)

■ "Generally, a court is without power to interfere with purely legislative action, and when the Legislature has committed to a municipal body the power to legislate on a given subject, the court has no power to command or prohibit the exercise of the legislative function. . . . [¶] . . . [T]he adoption of the budget is clearly a legislative function." (*Hicks v. Board of Supervisors* (1977) 69 Cal.App.3d 228, 235 [138 Cal.Rptr. 101].) But the power to adopt a budgeted expenditure does not insulate the County from judicial attack.

■ Section 66016, subdivision (a) imposes a duty on the County to use excess regulatory fee revenues to reduce future fees. And section 54985 imposes an additional duty on the County to set its regulatory fees "in the amount *reasonably necessary* to recover the cost of providing any product or service or the cost of enforcing any regulation for which the fee or charge is levied." (§ 54985, subd. (a), italics added.) These duties may be enforced by "an interested person" through a validation action. (§ 66022; Code Civ. Proc., § 860 et seq.) Thus, judicial inquiry into the "reasonableness and necessity" of fee expenditures is legislatively sanctioned and does not violate the separation of powers doctrine.

2. *The burden to prove the surplus expenditures were*
*reasonable and necessary was properly allocated to the*
*County*

The County argues the trial court incorrectly required it to demonstrate that its surplus expenses were reasonable. It argues that Barratt had the burden of proof under the general rule of Evidence Code section 500: "Except as otherwise provided by law, a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting."

■ Evidence Code section 500 merely states the general rule. As recognized in the Law Revision Commission comments to the section, "the burden of proof is sometimes allocated in a manner that is at variance with the general rule. In determining whether the normal allocation of the burden of proof should be altered, the courts consider a number of factors: the knowledge of the parties concerning the particular fact, the availability of the evidence to the parties, the most desirable result in terms of public policy in the absence of proof of the particular fact, and the probability of the existence or nonexistence of the fact. In determining the incidence of the burden of proof, 'the truth is that there is not and cannot be any one general solvent for all cases. It is merely a question of policy and fairness based on experience in the different situations.' 9 Wigmore, Evidence § 2486 at 275 (3d ed. 1940)." (Cal. Law Revision Com. com., West's Ann. Evid. Code (1995) foll. § 500, p. 554.)

The situation here is similar to that in *Oildale Mutual Wat. Co. v. North of the River Mun. Wat. Dist.* (1989) 215 Cal.App.3d 1628 [264 Cal.Rptr. 544]. In *Oildale*, a water company brought an action against a water district, alleging that its operation and maintenance charges violated California Constitution, article XIII B, section 1, because the charges exceeded its appropriations limit. The trial court found that the water company had the " 'burden of proof on whether the revenues from the water charges exceed[ed] the costs reasonably borne in providing [the water].' " (215 Cal.App.3d at p. 1632.) The appellate court reversed, finding that placing the burden of proof on the water district would ensure an adequate record of governmental compliance. "[T]he court was requested to determine whether the fee imposed by the water district exceeded the reasonable cost of providing the water. . . . If Oildale is required to prove that the fees charged by the District are excessive . . . , it would give the District a litigational advantage to maintain incomplete or misleading records regarding the costs of providing water to Oildale. . . . Further, since it is the District that makes the expenditures and keeps the records, it is the District that has the knowledge of and access to the evidence regarding its compliance with article XIII B." (*Id.* at p. 1634.)

Here, the trial court found the burden of proof should be on the County because "[t]he defendants are in a better position to know what they spent the surplus for and whether the expenditures were allowable as indirect costs pursuant to OMB A-87." This is an appropriate allocation of the burden of proof.

### 3. *Substantial evidence supports the trial court's determination that surplus expenses of $4.5 million were not reasonable and necessary*

The County criticizes the trial court's calculations in the minute order of January 3, 2005. It contends the trial court miscalculated the increased labor costs and revenue losses between 1999 and 2002 because it failed to consider the increases and losses in the intervening fiscal years. It also contends the trial court misstated the value of the APPS computer software system as $5.5 million despite the parties' stipulation that its cost was $5,714,243. But we are not limited to a review of the minute order; our task is to search the entire record for substantial evidence to support the judgment. (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1053 [68 Cal.Rptr.2d 758, 946 P.2d 427].)

As the County concedes, the trial court's minute order was not a statement of decision. Without a statement of decision, and timely objections to any ambiguities or omissions in it, the doctrine of implied findings applies. "The doctrine of implied findings requires the appellate court to infer the trial court

made all factual findings necessary to support the judgment. [Citation.] The doctrine is a natural and logical corollary to three fundamental principles of appellate review: (1) a judgment is presumed correct; (2) all intendments and presumptions are indulged in favor of correctness; and (3) the appellant bears the burden of providing an adequate record affirmatively proving error. [Citations.]" (*Fladeboe v. American Isuzu Motors, Inc.* (2007) 150 Cal.App.4th 42.)

The County claims the doctrine of implied findings does not apply because the case was tried only on stipulated facts; it urges us to disregard the findings of the trial court and engage in a de novo review. But the question whether the expenses were reasonable and necessary is inherently factual. In addition to the stipulated facts, the parties stipulated to the admissibility of myriad exhibits, the reports of experts and the special master, and declarations in lieu of testimony. The trial court expressly considered all this evidence in making its ruling.

The County argues the special master's findings were outside the record because the trial court did not formally adopt them, thus reducing them to "mere[] testimony that the County later showed was inaccurate." We fail to understand the County's reasoning on this point. The report was admitted into evidence; accordingly, like the rest of the evidence, it provides a basis for the trial court's decision. We look for substantial evidence, contradicted or uncontradicted, to support the judgment. (*Bickel v. City of Piedmont, supra,* 16 Cal.4th at p. 1053.)

There is ample evidence to support the trial court's conclusion that the County did not carry its burden to show $4.5 million of surplus expenditures were applied to reasonable and necessary costs of the fee-related services. Both the special master and Holder reported that the County failed to explain the startling increases in overhead—"a 206% increase in three years." The special master reported the expenses from Fund 113, excluding the APPS costs of $5 million, increased by $5.8 million from fiscal year 1998/1999 through fiscal year 2001/2002. This increase was notwithstanding the reasonable expectation of little, if any, growth. Holder reported that "the County came to incur costs greatly in excess of those that would have been reasonably necessary to meet the demand ultimately experienced during the time period in question." Because the County failed to provide Holder with adequate evidence to support the increased expenses, Holder concluded they were not reasonably necessary. This evidence supports the trial court's conclusion that surplus expenditures of $4.5 million were not reasonable and necessary.

### 4. *The County's procedural challenges to the writ of mandate and the validation action are without merit*

Citing *Rancho Cucamonga*, the County asserts that Barratt's petitions for writs of mandate were unauthorized because it had the legal remedy of validation actions available to challenge Resolution 99-176 and Ordinance No. 01-02 under section 66022. In *Rancho Cucamonga*, the court held that the developer was time-barred from bringing a validation action as to two of the three city resolutions it sought to challenge, but the validation action as to the third resolution was timely and was permitted to go forward. The developer had also petitioned for a writ of mandate "to compel the City to conduct a review and apply any surplus building permit and plan review fees to reduce prospective fees, in compliance with section 66016." (*Barratt American, Inc. v. City of Rancho Cucamonga, supra,* 37 Cal.4th at p. 704.)

■ The court held the remedy of mandate was unavailable to challenge the first two resolutions: "Where the Legislature has provided for a validation action to review government actions, mandamus is unavailable to bypass the statutory remedy after the limitations period has expired." (*Barratt American, Inc. v City of Rancho Cucamonga, supra,* 37 Cal.4th at p. 705.) As to the third resolution, the court held "a parallel mandate action would be unnecessary and inappropriate" because the validation action was going forward and mandate would issue only where "there is *not* a plain, speedy, and adequate remedy in the ordinary course of law." (*Ibid.*) The court expressly did not decide "whether the Court of Appeal correctly held that courts cannot enforce a local agency's section 66016 duty to review and adjust building permit fees by way of a writ of mandate." (*Ibid.*)

The situation here is different. Barratt brought a validation action to challenge Resolution 99-176; when Ordinance No. 01-02 was passed, the resolution was rescinded. Accordingly, Barratt dismissed the validation causes of action from the first complaint as moot when it filed the second complaint challenging Ordinance No. 01-02. The County argues the second validation action is also moot because the County replaced Ordinance No. 01-02 with Orange County Ordinance No. 03-011 in March 2003, after the $18.5 million surplus had been dissipated.[5] In effect, the County argues Barratt is now without a remedy based on *Rancho Cucamonga.*

---

[5] Pursuant to Barratt's request, we take judicial notice of the fact that it has filed three subsequent actions: the first, to Orange County Ordinance No. 03-011; the second, to Ordinance No. 04-007, adopted May 25, 2004; and the third, to Ordinance No. 05-015, adopted July 26, 2005. Each action contains both a validation action and a petition for writ of mandate. The parties have stipulated to stay the superior court proceedings on these three cases pending the outcome of this appeal.

The *Rancho Cucamonga* court based its ruling on the fact that the developer had an available legal remedy. If both of Barratt's validation actions are moot, it has no "plain, speedy, and adequate remedy." Under these circumstances, mandate is appropriate.

### 5. *The award of attorney fees was not an abuse of discretion*

The County contends the award of attorney fees under the private attorney general statute (Code Civ. Proc., § 1021.5) was erroneous because the litigation did not meet all the criteria for such an award. Specifically, it contends Barratt did not vindicate an important public right, did not achieve a significant public benefit, and did not show that the cost of its legal victory is more than its stake in the matter.

■ "[Code of Civil Procedure] [s]ection 1021.5 'codifies the "private attorney general" doctrine of attorney fees articulated in *Serrano v. Priest* (1977) 20 Cal.3d 25 [141 Cal.Rptr. 315, 569 P.2d 1303] . . . and other judicial decisions. [Citation.]' [Citation.] The statute gives the trial court discretion to award fees to a successful party if (1) its action has resulted in the enforcement of an important public right, (2) the general public or a large class of persons has received a significant benefit, (3) the burden of private enforcement is disproportionate to the litigant's personal interest, and (4) it is unfair to make a successful plaintiff pay the fees out of any recovery. [Citations.]" (*Concerned Citizens of La Habra v. City of La Habra* (2005) 131 Cal.App.4th 329, 334 [31 Cal.Rptr.3d 599], fn. omitted.) The trial judge is considered to be in the best position to determine whether the criteria have been met, and its determinations will not be disturbed " 'unless the appellate court is convinced that it is clearly wrong.' " (*Serrano v. Priest, supra,* 20 Cal.3d at p. 49.)

The County argues that no important public right was vindicated by the litigation because the County lowered its fees voluntarily before the litigation was filed. But the litigation was directed to the use of the surplus. Barratt's actions resulted in an order that the County use $4.5 million to reduce future regulatory fees. Ensuring that the County fulfill its statutory duty to use the fee revenue surplus vindicates an important public right. The trial court found this was a significant benefit to those who apply for permits and plan checks, and an indirect benefit to home purchasers in Orange County. This finding was not an abuse of discretion.

The County also argues that Barratt was motivated by profit rather than a desire to protect the public interest, pointing out that its attorney was retained on a contingency basis. While profit may have been a consideration, that does

not vitiate the protection of a public interest. Barratt paid over $100,000 for its share of fees for the special master and Holder, as well as over $55,000 in miscellaneous litigation costs. It expected to recover $42,000 in refunded fees when it filed the first action against the County.[6] Barratt's president declared the company would "also receive some partial benefit from future reductions of building permit and plan check fees, because we are in the business of residential housing development, but . . . we have no major projects currently in progress in Orange County at this point in time." The County has not shown an abuse of discretion.

## DISPOSITION

The judgment is affirmed. Barratt is entitled to costs on appeal.

O'Leary, J., and Moore, J., concurred.

A petition for a rehearing was denied May 29, 2007, and the petition of defendants and appellants for review by the Supreme Court was denied August 8, 2007, S153523.

---

[6] Barratt did not recover the refund; under *Rancho Cucamonga*, refund is not a remedy for excessive regulatory fees, just for development fees.